FILED

United States District Court
Northern District of Alabama
Southern Division

03 JUL -3 AM II: 09

U.S. DISTRICT COURT
N.D. OF ALABAMA

Kenneth Earl Dukes,                    ]
                                       ]
      Plaintiff(s),                    ]
                                       ]
      vs.                              ]    CV-01-CO-2820-S
                                       ]
Shelby County Board of                 ]
Education,                             ]                     ENTERED
                                       ]
      Defendant(s).                    ]              JUL 0 3 2003

Memorandum of Opinion

I.    Introduction.

      The court has for consideration, defendant Shelby Board of

Education's motion for summary judgment, received February 18,

2003.[1] (Doc. #29). The plaintiff Kenneth Earl Dukes, filed suit on

November 5, 2001, alleging violations of Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*., as amended by the

Civil Rights Act of 1991 and 42 U.S.C. § 1983. (Doc. #1, *Compl*).

This action arises under the First and Fourteenth Amendment to the

United States Constitution.  Subject matter jurisdiction is invoked

pursuant to 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. § 2000e, *et*

*seq*. The issues have been briefed by both parties, and after

consideration of the arguments of both parties, the court finds

that the motion is due to be granted on all counts.

_____

      [1]Although the docket lists May 28, 2003 as the date of filing, the court notes
that the docket sheet indicates it was filed May 28, 2003 but deemed received
February 18, 2003 pursuant to Document #22.

II.  Facts

Pursuant to its personnel policies, on August 14, 2000, the Shelby County Board of Education "BOE" posted a job notice for a new position which was Transportation Route Supervisor ("TRS"). (Doc. #26, Exh. #11).  The policy requires the advertising of all postings.  Such a posting must include job qualifications, a job description, a salary schedule, and other relevant qualifications. On August 14, 2000, a revised notice was posted to correct a clerical error relating to the salary schedule listed in the original posting because the salary range was misstated.  Then, on September 5, 2000, the BOE reposted the revised notice and extended the application deadline.  The job description on the final notice listed the following as qualifications: (1) high school graduate; (2) complete understanding of bus route and safety issues; (3) a minimum of five years of successful experience in school transportation; (4) possess a valid Alabama driver's license; (5) and alternatives to the above qualifications that the BOE might find applicable and acceptable. (Doc. #26, Exh. #10). A personnel clerk, Kelly Coyte drafted the qualifications list and job description which she drew from an organized list. (Doc. #26, Exh. #2, pp. 46-47).

The plaintiff Kenneth Dukes ("Dukes") is an African -American Male who is currently employed by the BOE as a bus driver and assistant coach.  Dukes was a substitute driver from 1985 until

1988 when he became a full-time driver. Dukes submitted his application on September 8, 2000 which he described as somewhat "shabby," that is, lacking in specificity regarding his various skills. (Doc. #29, Exh. A, pp. 159, 164-65). Dukes was less than painstaking while completing the application because he believed the committee would base its decision on their interactions with him rather than his application. (Doc. #29, Exh. A, p. 165). Dukes's application indicated that he graduated from Mandevilla High School, worked since 1985 as a bus driver and assistant football and basketball coach, completed thirteen years of state certifications classes, placed first in the bus driver "rodeo" (a state-wide competition to test various bus driving skills), and that he worked well with people. (Doc. #26, Exh. #14). Under the special qualifications skills, the applicant listed that he was "just blessed." (Doc. #26, Exh. #14). The plaintiff's evidence also indicates that he attended the University of Mandevilla for the summer after graduating from high school and was unable to continue because he could not afford it financially, became a minister, took classes at Birmingham Baptist Bible College and during several summers he worked for Central Alabama Public Transportation part-time as a route coordinator. (Doc. #26, Exh. #1, pp. 12-13, 23). As a Route Coordinator he organized pickups of soccer program participants, handling the routing, the number of buses that would be needed for the number of children arriving, and

ensuring there would be drivers present. (Doc. #26, Exh. #1, pp. 23-24). Although there is evidence that members of the selection committee knew the plaintiff was a minister, there is no evidence that anyone knew of his position as a route coordinator. (Doc. #26, Exh. #3, p. 212).

The BOE received 30 applications for the TRS position from both its current employees and the employees of other school systems and other industries with varying skills, experience, and talent. Members of the selection committee included John Wright, Assistant Superintendent of Administration and Deputy Superintendent, Evelyn Blake, Assistant Superintendent of Personnel, and Jerry Davidson, Transportation Route Coordinator. The committee met only once to discuss the list of applicants. Prior to reviewing the list of applicants the committee briefly discussed the characteristics of an ideal candidate. (Doc. # 29, Fact ¶ 20). For example, Blake indicated that a good supervisor would have "good people skills, good communication skills, good organizational ability." (Doc. #26, Exh. #2, p. 88; Doc. #29, Exh. H, p. 58). Apparently the committee also considered computer skills as an additional qualification-booster, and they thought it was implied in the job description. (Doc. #26, Exh. #2, p. 63). During that meeting Blake presented the applications and they divided the candidates in two piles, those they were interested in and those they were not. (Doc. # 26, Exh. 2 pp. 56-57). The

committee made the decision based on the application and the knowledge that Wright and Davidson had of each candidate. (Doc. #26, Exh. 2, p. 57). In making the decision, the committee did not go through each qualification, in fact the committee determined that there were people who did not have a commercial driver's license who could be successful in the position because it was not a difficult certification to obtain. (Doc. #26, Exh. #2, pp. 71-72). When Dukes's application was reviewed, it was quickly dismissed because Davidson believed that he would be unable to handle the job. (Doc. #26, Exh. #2, pp. 64-67). The committee did not discuss his candidacy further or probe Davidson for the reasons supporting his opinion. After reviewing the applications, the committee narrowed the field to six candidates, Kevin Snowden, Connie Brady, Denise Parker, Charles Dickinson, Cathy Burnett, and Robert Hoffine. One of the candidates, Charles Dickinson, was an African-American male. Following the interview process, the committee selected Kevin Snowden ("Snowden"), a white male, for the job. (Doc. #29, Exh. M). Previously, Snowden was employed as a Band Director at Thompson Middle School, he had also worked as a substitute bus driver. His application also indicated that he was an Eagle Scout and had been named among the Outstanding Men in American and the Outstanding Teachers in America. Moreover he informed the committee that he enjoyed "troubleshooting" that is finding solutions to problems as they arise.(Doc. #26, Exh. 15). He

did not possess a school bus license and his work as a substitute bus driver met the five year requirement but ended prior to the application. (Doc. #29, Exh. M). The committee selected him due to his organizational ability as demonstrated through his management of the band and the likely ability to handle complaints.

The SOE has an Equal Employment policy which states:

> [N]o person in the school district shall, on the basis of age, race, color, religion, sex, national origin, marital or veteran status, the presence of a no-job related medical condition or handicap, or any legally protected status, be denied the benefits of or be subject to discrimination in regard to employment, retention, promotion, transfer, or dismissal in any educational program or activity under the jurisdiction of the board.

(Doc. # 26, Exh. #12). SOE employs, one African-American as a principal in its thirty-five schools, one African-American out of the four coordinator positions, and no African-Americans as mechanics or as staff in the transportation department. (Doc. #26, Exh. 2, p. 81). In addition, there is some evidence that an additional applicant, Denise Parker, who also interviewed for the TRS position considered Davidson to be a racist. (Doc. #26, Exh. 6, p. 30). This belief is based on conversations she had with Davidson where he stated that he did not believe in inter-racial dating and other comments he made which she could not recall, as well the recollections of SOE mechanics who indicated that Davidson had made racial statements though Davidson himself was not present when the mechanics commented on them. (Doc. #26, Exh. 6, pp. 26-

30).  Dukes also stated that Wright gave him incorrect information regarding participation in a golf tournament and made belittling comments directed towards himself and other African-American employees.  Finally, all of the members of the committee indicated that they had made racial jokes at some point in their youth.

III. Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Celotex*, 477 U.S. at 322-23.  There is no requirement, however, "that the moving

party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id*. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Id*. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. "[T]he judge's function is not himself to weigh the

Page 8 of  27

.

evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 746 n.11 (1983) (indicating the standard for summary judgment is "[s]ubstantively . . . very close" to that for motions for directed verdict). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989).

Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are functions of the jury, and, therefore, "[t]he evidence of the nonmovant is to be

believed and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.  The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

IV.  Discussion.

The defendant has moved for summary judgment on both the § 1983 and Title VII  claims.  The analysis is the same for both causes of action. *Cross v. State of Alabama*, 49 F.3d 1490, 1508 (11th Cir. 1995).  As the plaintiff has presented no direct evidence of discrimination, the court will apply the tripartite framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973).

A.   General Analytical Framework

If Dukes is to prevail on his disparate treatment claims, he must submit some proof of his employer's discriminatory motive, that is, some causal link between his race and the actions of which he complains.  *See Chapman v. AI Transport*, 229 F.3d 1012 (11th Cir. 2000).  In a Title VII case such as this, where the plaintiff relies solely upon circumstantial evidence, the plaintiff has the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253-254 & n. 6 (1980).  "Demonstrating a prima facie case is

not onerous, it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Lathem v. Department of Children & Youth Servs.*, 172 F.3d 786, 792 (11th Cir. 1999).

Once the plaintiff establishes a prima facie case, the burden of production then shifts to the employer to articulate a "legitimate nondiscriminatory reason" for the alleged discriminatory employment action. *Lathem*, 172 F.3d at 793. "To satisfy that burden of production, '[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'" *Chapman*, 229 F.3d at 1024 (quoting *Burdine*, 450 U.S. at 254-55 (citation and footnote omitted)).

After the employer presents a legitimate nondiscriminatory reason for its action, the presumption of discrimination is eliminated leaving the elements of the prima facie case. *Id.* at 1024-25. The plaintiff must then prove by a preponderance of the evidence that the reason offered by the employer was not the true reason for the employment decision, but rather is a mere pretext for discrimination. *Id.* The plaintiff may meet this burden by persuading the fact-finder either directly that a discriminatory reason more than likely motivated the employer, or indirectly that the employer's proffered explanation is unworthy of belief. *Id.*

If the plaintiff succeeds in meeting this burden, the disbelief of the defendant's proffered reasons, together with the prima facie case, is sufficient circumstantial evidence to support a finding of discrimination and preclude summary judgment.  *Id.* at 1025.

    B.   Prima Facie Case

    The defendant addresses the case as a failure to promote case and therefore lists the following as elements the plaintiff must prove to establish a prima facie case: (1) the plaintiff is a member of a protected class; (2) he was qualified for and applied for the position; (3) he was not hired for the position; (4) and an equally or less qualified employee who is not a member of the protected class got the position. *Denny v. City of Albany*, 247 F.3d 1172, 1182 (11th Cir. 2001); *Lee v. GTE Florida Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000); *Durley v. APAC Inc.*, 236 F.3d 651, 655-56 (11th Cir. 2000).  The plaintiff did not directly dispute the application of the failure to promote rubric. In *Patterson v. McLean Credit Union*, the Supreme Court defined a promotion for purposes of 42 U.S.C. §1981 claims as a situation where the nature of the change is a "new and distinct relation" such that it "involved the opportunity to enter into a new contract with the employer." 491 U.S. 164, 185 (1989); *Guzman v. El Paso Natural Gas Co.*, 756 F. Supp. 994, 997-98 (W.D. Tex. 1990). *Cf. Wood v. Irving*, 623 N.Y. 2d 824, 827 (N.Y. App. 1995) (defining promotion as an "advancement to a higher position in grade, class or rank [or]

preferment in honor or dignity" for a civil service position)
(quoting *People ex rel. Campbell v. Partridge*, 85 N.Y.S. 853
(1903)). Although the record does not specifically indicate that
Dukes would be given a new contract, the court finds that because
the position offered the opportunity to advance in both pay and
rank, it is reasonable to conclude that the plaintiff would have
perceived the job change as a promotion from his current role as a
bus driver.[2]

The caselaw addressing the fourth prong of the prima facie
failure-to-promote case is far from clear. In one case, the court
held that a plaintiff must prove that he was minimally qualified
and that  someone outside of the protected class received that
promotion. *See Walker v. Morthan*, 158 F.3d 1177, 1188 n.23 (11th
Cir. 1998). Yet other, more recent, cases suggest that the relative
qualifications element is still present. *See Denny v. City of
Albany*, 247 F.3d 1172, 1183 (11th Cir. 2001). District courts have
interpreted the requirements of the prima facie case differently
post *Walker*. *See Miller v. Bed, Bath & Beyond*, 185 F. Supp. 2d
1253, 1267 n.14 (N.D. Ala. 2002) (reviewing Eleventh Circuit
history after *Walker* and noting that although dicta called the

---

[2] The plaintiff listed the prima facie case as a discriminatory hiring
practices case where the prima facie elements are: (1) the plaintiff is a member of
a protected group; (2) the plaintiff was qualified for and applied for the job in
question; (3) the plaintiff was rejected for the employment regarding the job in
question; (4) the individual who received the job in question is not a member of the
protected group and had lesser qualifications. *Carter v. Three Springs Residential
Treatment*, 132 F.3d 635 (11th Cir. 1998) (citing *McDonnell Douglas Coirp. v. Green*,
411 U.S. 792, 802 (1973)). The plaintiff never directly disputed the application
of the failure to promote framework applied by the defendant.

holding into question it remains good law); *Cooper v. Southern Co.*, 2003 WL 1889268, – F. Supp. 2d – (N.D. Ga. 2003) (citing *Denny* but not listing the relative qualifications element as the fourth prong).

As the court indicated in a previous section, meeting the prima facie requirement is not "onerous." *Lathem v. Department of Children & Youth Servs.*, 172 F.3d 786, 792 (11th Cir. 1999). The defendant argues that the plaintiff has not established that he could meet both the job qualifications and the additional ten performance responsibilities. Nevertheless, the court finds that it is more appropriate to parse through the plaintiff's qualifications at the pretext stage. From Dukes's application, the court finds that he was minimally qualified and the court will proceed to the next step in the analysis. *Miller*, 185 F. Supp. 2d at 1267 n. 14; *Cooper* 2003 WL 1889268.

C.   Legitimate Non-Discriminatory Reason

As Dukes has satisfied the prima facie showing, the burden now shifts to the BOE to articulate one or more "legitimate, non-discriminatory reasons for its employment action." *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997). This burden is "exceedingly light," *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138 (11th Cir. 1983), and the defendant "need only offer admissible evidence sufficient to raise a genuine issue of material fact as to whether it had a legitimate reason." *Hill v. Seaboard C.L.R. Co.*,

767 F.2d 771 (11th Cir. 1985).  "The defendant's explanation of its legitimate reasons must be clear and reasonably specific' so that 'the plaintiff be afforded a full and fair opportunity to demonstrate pretext.'" *Chapman v. AI Transport*, 229 F.3d 1012, 1033 (11th Cir. 2000) (quoting *Burdine*, 450 U.S. at 258).

The BOE proffers that it considered both the job qualifications and the performance responsibilities and did not hire the plaintiff because it believed that there were other applicants who were more qualified for the position.  The BOE has also stated that it determined that Snowden was more qualified due to his prior experience as a band director and over ten years of bus-driving experience.  The defendant has  provided deposition testimony which indicates that it had certain qualities in mind such as good communication skills, good organizational skills, and good interpersonal skills which the court finds to be inherent in the title of supervisor. The selection committee found that such prior experience provided Snowden with desirable skills such as organizational skills, scheduling, interacting with the entire school community and the ability to handle multiple tasks at once.

The plaintiff argues that this reason is not sufficient to meet the employer's burden for two reasons: (1) the selection committee did not consider organizational skills and other qualifications at the time it made the employment decision and (2) it did not consider his application. *See Turnes v. AmSouth Bank*,

*NA*, 36 F.3d 1057, 1061-62 (11th Cir. 1994) (holding that an employer could not create a reason after the fact as justification for an employment decision); *Joshi v. Florida State University Health Center*, 763 F.2d 1227, 1235 (11th Cir. 1985)(holding when the employer does not consider an applicant for a position he cannot consider the relative qualifications of other applicants cannot be used as a reason not to hire the applicant who is the subject of the litigation); *Mays v. Union Camp Corp.*, 114 F. Supp. 2d 1233, 1243 (M.D. Ala. 2000)(same).

In this case the court finds that the SOE has met its burden as there is sufficient evidence that the employer did consider the qualities it sought in a supervisor prior to reviewing the plaintiff's application, and that it did in fact consider the plaintiff's application.  The plaintiff attempts to argue that the job application should have been an exhaustive list of all possible qualifications for the job.  Following this argument, because the defendant did not list skills such as effective communication and organization, therefore it cannot prove that it considered them prior to the commencement of the instant lawsuit.  The court finds that the defendant has met its burden as it has provided sufficient evidence that the committee members discussed the qualities they were looking for in a candidate. (Doc. #26, Exh. # 2, pp. 88-89;

Doc. #26, Exh. #3, pp. 58-60).[3]  Moreover, the title "supervisor" and the accompanying performance responsibilities implied that the employee would have to embody certain leadership characteristics. It is no great stretch to claim that skills such as organizational ability and strong communication skills would generally be applicable to the title.  Accordingly, the court finds that the plaintiff's argument that the defendant did not consider the qualities it sought in an applicant to be without merit.

Similarly, the court finds the plaintiff's argument that the plaintiff was not considered for the position unworthy of credence. The applicants in the cases cited by the plaintiff were actually not considered, meaning that the relevant selection committee did not review their applications.  *See Joshi*, 763 F.2d at 1235 (employer's proffered nondiscriminatory reason determined insufficient where there was no evidence that her application was considered); *Mays*, 114 F. Supp. 2d at 1241-42 (holding relative qualifications not a defense where the employer stated a different reason why it did not promote the plaintiff).  Conversely the defendants have presented evidence that they presented Dukes's application, considered it, and rejected it because he failed to meet the standard of applicant they were looking for.  Although the defendant did not specifically document the reasons why it rejected

---

[3]It is interesting to note when asked what skills would be necessary to perform the TRS job effectively, Dukes answered: "I think you would have to have good communications skills. You would have to have a lot of patience in dealing with adults." (Doc. #26, Exh. 1, p. 178).

the plaintiff's application in the meeting, it finds that there is evidence the committee considered Dukes for the position based on what was stated on the application and what the committee knew of the applicant.  The court finds it somewhat disingenuous for the plaintiff to argue that he hastily completed the application because he thought the members of the committee would make their decision based on knowledge its members had of him and then to maintain that they failed to scrupulously  consider each detail of his application.  Accordingly, the court finds that the employer has presented a legitimate non-discriminatory reason why it rejected Dukes's application and the court will proceed to the next stage of the analysis.

    D.   Evidence of Pretext

    Dukes must now persuade the court that the "proffered reason was not the true reason for the employment decision ... [t]his burden now merges with the ultimate burden of persuading the court that he has been the victim of intentional discrimination. He may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256.  In proving pretext a "plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer.  Provided that the proffered

reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it and the employee cannot succeed by simple quarreling with the wisdom of that reason." *Chapman*, 229 F.3d 1012 (citation omitted).

Establishing pretext is even more difficult in a failure to promote case. "In a failure to promote case a plaintiff cannot prove pretext simply by simply showing that she was better qualified than the individual who received the position that she wanted. ... '[D]isparities in qualifications are not enough in and of themselves to demonstrate discriminatory intent unless those disparities are so apparent as virtually to jump off the page and slap you in the face.'" *Denny v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir. 2001) (citations omitted). More precisely, these "disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chose the candidate selected over the plaintiff for the job in question." *Deines v. Texas Dep't of Protective and Regulatory Servs.*, 164 F. 3d 277, 280-81 (5th Cir. 1999).

The plaintiff may attempt to prove pretext by providing the following types of information: (1) direct evidence of discrimination such as discriminatory statements; (2) comparative evidence and (3) statistics. *Miles v. M.N.C. Corp*, 750 F.2d 867, 870 (11th Cir. 1985). The plaintiff has presented the following

reasons: (1) the BOE's failure to list every quality it was looking for in a supervisor on the job description; (2) Dukes's superior qualifications in all of the unstated areas; (3) evidence of discriminatory animus on the part of the BOE.

        a.    The Job Description and Failure to Adhere to Normal Hiring Practices

The plaintiff contends that the BOE's selection process for the TRS position deviated from its normal hiring procedures and thus suggests discrimination.[4] *See Morrison v. Booth*, 763 F.2d 1366, 1374 (11th Cir. 1985) (evidence that employer "bent" rules to benefit white applicant can be evidence or pretext); *Walker v. Prudential Property and Casualty Ins. Co.*, 286 F.3d 1270, 1279 (11th Cir. 2002); *Carter v. Three Springs Residential* Treatment, 132 F.3d 635, 644 (11th Cir. 1998); *Long v. Chesapeake and Ohio Rwy. Co.*, 1986 WL 15503 (E.D. Va. 1986). In *Morrison*, the plaintiff applied a merit system based pay scale in a manner that benefitted white applicants over African-American applicants. 763 F.2d at 1374. As a threshold matter the court notes that the applications did not ask the applicant's race, therefore any applicant that the board was not already familiar with started with a clean slate. Furthermore, the alleged bending of the rules did not prevent Charles Dickinson, an African-American male from

---

[4]The court notes that the plaintiff included numerous statements of fact regarding the selection of Snowden over Dickinson. The court however has limited its inquiry to the selection process prior to the interviews because that was the portion of the process where Dukes contends that he was discriminated against.

advancing to the final round of the hiring process.[5]  In addition, the plaintiff has provided no evidence that the defendant behaves differently in other employment contexts.  The plaintiff provided evidence in the form of generalized personnel policies which indicate that the employer must list job qualifications. (Doc. #26, Exh. #11).  However, the plaintiff fails to address the ten additional job performance responsibilities and the skills required to complete them.  The plaintiff has merely persuaded the court therefore, that the defendant considered many factors in determining which candidates were capable of performing the job. The plaintiff has not proven that the board deviated from its policies specifically to benefit white applicants.  Accordingly the court cannot find that the alleged deviation is evidence of pretext.

b.   Qualifications of the other candidates

Dukes also argues that the failure to hire him when he was equally or more qualified than Snowden is evidence of pretext. Looking at the candidates for the interviews the court cannot conclude that there is evidence that there were gross disparities

---

[5]The plaintiff has included several additional facts about the final selection of Snowden rather than Dickinson.  This evidence might have been helpful to Dickinson had he chosen to bring such a case however the court finds that the more appropriate inquiry is the selection of candidates for an interview because that is where Dukes's application was actually considered.

in qualifications.   The following is a brief survey of their qualifications.[6]

Burnett was a white female employed by Hoover City Schools in a position comparable to that of the TRS.   She develops all bus routes for Hoover and had occupied that position since 1999.   Prior to Hoover, she worked for a commercial transportation company, Transportation South as a warranty administrator.

Hoffine was a white male who had over twenty years of experience in the transportation business.   He had prior management, administrative, and supervisory experience.   He also indicated that he has experience with handling complaints, safety issues relating to transportation and dealing with the general public.   He had a bachelors of science in business administration and attended the graduate school of management at the University of Michigan, the Du Pont Safety Program and several finance courses and employee relations courses.

Brady, a white female was also a bus driver for Shelby for twelve years.   She had also been a councilwoman for the City of Helena.   Thus, the selection committee believed that Brady would have good people skills, communication skills and public relations skills.   Likewise, Parker, a white female was also qualified for the position.   She had been performing many of the duties required

---

[6]The court has not included the qualifications of Snowden and Dukes because they are not included in the statement of facts portion.

of the position in her then position as Clerk Typist II of the Transportation Department for the past 8 years.  She was familiar with the mapping software which would be used by the TRS to map bus routes.  She also had experience helping parents, teachers and students with bus routing problems and safety issues.

Dickinson was a black male who had a Bachelor of Science in Physical Education from the University of Mandevilla.  He had a minor in driver education and had taught Driver's Ed for nineteen years.  He also helped to coordinate transportation of the Shelby County High school athletic program and had attended seminars and workshops related to drivers education.  Moreover, he had also been selected as the Teacher of the Year in both 1989 and 1999 (Doc. #29, Exh. P).

The parties have both presented the court with a number of charts, etc. which demonstrate that the SOE did not rigidly adhere to its job qualification list.  Moreover the parties have also included several charts comparing the various candidates and the information that Dukes did not did not include on his application. The court finds that a review of the applicants does not indicate disparities "so apparent as to virtually jump off the page and slap [me] in the face." *Denny*, at 1187.  Instead the court finds that the SOE was selecting from a number of qualified applicants and that it selected the ones to interview that it deemed best for the job. As courts often state "Title VII is not designed to make

federal courts 'sit as super personnel deparmtent[s] that reexamine an entity's business decisions.'" *Id.* at 1188 (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991). The court does not ask "whether the employer selected the 'most' qualified candidate, but only whether it selected the candidate based on an unlawful motive.'" *Id.* In this case there is evidence that there were several highly qualified candidates for the position. Accordingly the court does not find the differences in qualifications to be sufficient to establish pretext for discrimination.

        c.   Evidence of Discriminatory Animus by the BOE

The plaintiff's final two arguments in support of pretext are: (1) the number of African American employees employed by the Board and (2) deposition testimony that Davidson is a racist. Neither is sufficient to establish pretext. The plaintiff may introduce statistical evidence, such as the number of African-Americans employed by the SOE to show a general pattern of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 805 (1973). Such evidence, however, is less probative than other forms of evidence. *See e.g.*, *Runnery v. Illinois*, 250 F.3d 553, 559 (7th Cir. 2001) ("while statistics may be used to demonstrate that the employer's proffered reason for discharge is pretextual, standing alone they are not likely to establish a case of individual disparate treatment."); *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1283 (9th

Cir. 2000) (statistics that describe the protected class only in general terms, and that "fail to account for many factors pertinent to the plaintiff's specific employment situation are not sufficient to create inference of pretext"); *Martinez v. Wyoming Dep't of Family Servs.*, 218 F.3d 1133, 1139 (10th Cir. 2000 ) (statistics that failed to "eliminate nondiscriminatory explanations for numerical disparities" were of little probative value and insufficient to demonstrate bias). In this case the plaintiff has provided no information about the applicant pool, the qualifications or other types of information to show that the alleged bias on the part of the BOE was in fact due to race. Accordingly, the court notes that the plaintiff presented the evidence, but accords it little value.

The plaintiff relies on the deposition of Denise Parker and Kenneth Dukes to establish that the committee members had demonstrated racial animus. The court finds the statements of Parker to be of limited value. Parker also applied for the TRS position. Although she actually advanced to the interview portion of the process, she was not selected for the position. Upon receipt of the notification that she was not selected, Parker was so upset that she left the office and took two personal days. (Doc. #29, Exh. 6, p. 16). Parker worked with Davidson for eleven years and never mentioned that he was a racist until the plaintiff wanted to depose her for this case. (Doc. #29, Exh. 6, p. 26). Moreover,

she cannot articulate any specific incidents which led her to the conclusion that Davidson was a racist. The following occurrences were the only specific forms of proof she could offer: (1) Davidson expressed that he disapproved of interracial dating; (2) she heard mechanics using the "N" word though she could not remember if Davidson was around; (3) a mechanic may have said that he did not think Davidson would want to work with African-Americans (Doc. #29, Exh. #6, pp. 61, 68). She could not remember any statements that Davison did not want to work with African-Americans, nor could she ever recall hearing him use the "N" word, or making any other racial comment. (Doc. #29, Exh. #6, pp. 67-69). Accordingly, the court finds Parker's testimony to be not sufficient to cast doubt on SOE's proffered non-discriminatory reasons. Likewise the court also finds the plaintiff's statements about John Wright to be of limited relevance to this case. The plaintiff stated that Wright talked down to him, that he gave him incorrect information regarding the price of a golf tournament, and that he took the word of a child once over him (Doc. #26, Exh. #1, pp. 92, 99, 116). Like Ms. Parker, the plaintiff could not recall any specific belittling statements and the court has no basis to evaluate the context of the other remarks. Statements that are not direct evidence of discrimination may be used as circumstantial evidence in determining whether there was a discriminatory motive. *Beaver v. Rayonier*, 200 F.3d 723, 730 (11th Cir. 1999); *Burrell v. Bd. of*

*Trustees of Ga. Military College*, 125 F.3d 1390, 1393 (11th Cir. 1997). Nevertheless in this case, the court finds that the statements are highly generalized and do not sufficiently cast doubt on the employer's motives in this employment decision.

In conclusion, the court finds the plaintiff has failed to meet his burden of creating a triable issue of fact regarding pretext. Accordingly, the defendant's motion for summary judgment is due to be granted in full.

V.   Conclusion.

The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this ___8th___ of July, 2003.

                                    _____
                                         L. Scott Coogler
                                    United States District Judge